### NEILON et al. v. TEXAS TRUST & SECURITY CO.

#### No. 8925.

Court of Civil Appeals of Texas. Austin.

Dec. 31, 1940.

Rehearing Denied Jan. 29, 1941.

S. C. Autry and Kerr & Gayer, all of San Angelo, for appellants.

H. S. Lattimore, of Fort Worth, for appellee.

McCLENDON, Chief Justice.

The Trust Company (Texas Trust & Security Company, appellee) sued Neilon and Cortese and wife (appellants) to enjoin them from obstructing a right-of-way easement over a strip of land 18 feet wide and 196 feet long, which strip adjoins on the north a tract 145 feet wide by 196 feet deep (designated for convenience the S. 145 feet) claimed by the Trust Company, as trustee, and which separates the S. 145 feet from Woodrow Street (San Angelo). In addition to formal pleas of general demurrers and denials by all defendants, Neilon, by way of cross-action, asserted title in himself to the 18-foot strip and prayed its recovery. The trial was to a jury; but at the close of the evidence, the court dismissed the jury and rendered judgment for the Trust Company establishing the right-of-way easement over the 18-foot strip, perpetually enjoining its obstruction, decreeing title in the Trust Company to the S. 145 feet, and denying Neilon recovery on his cross-action. The appeal is by Neilon and Cortese and wife from this judgment.

Appellants have briefed thirteen propositions. In order to a clear understanding of the points thus presented, we make the following statement of the controlling facts:

Prior to 1928 Cortese acquired the property comprising both the 18-foot strip and the adjoining S. 145 feet. This property had a west frontage on Oakes Street of 165 feet and a depth of 196 feet. Its north line was 11.25 feet north of the south curb line of Woodrow Street; which street is a cul-de-sac, its east end being closed and having no outlet except to the west into Oakes Street. There was then a two-story frame dwelling house on the S. 145 feet facing west on Oakes Street. In January, 1928, Cortese made arrangements with United Bond Company of Texas to finance a loan of $70,000 on the S. 145 feet, the proceeds to be used in erecting two two-story apartment houses on the property. In February, 1928, Cortese and wife executed a mechanic's lien to Marinick to secure him in the contract price of the apartment houses which Marinick agreed to build. December 15, 1928, Cortese and

wife executed a deed of trust to secure $70,000 in first mortgage gold bonds payable to bearer. Howard C. Wade, of Detroit Michigan, was the trustee and grantee in this instrument and the United Bond Company was named fiscal agent. The instrument is quite elaborate, comprising 42 pages of the statement of facts. It covered the S. 145 feet, including the apartments and all furnishings, fixtures and appliances. It gave to the trustee very extensive powers, including the right to take possession of the property and manage it in case of default, to sell at trustee's sale, in which event the trustee should have the right to purchase, to foreclose the lien by suit, and to appoint a cotrustee. Whether the apartments were completed at the time this trust deed was executed was disputed. At any rate, they were completed a short time thereafter, all, as testified to by Cortese in accordance with the original plans and specifications, with the single exception of the location of the sidewalk along Woodrow Street, hereafter noted. When the apartments and other improvements on the property were completed, the following physical facts were shown to exist by undisputed evidence. The two apartment buildings faced each other with a court 25 feet wide between them, opening on Oakes Street. This court had a concrete walk along its center, extending from the sidewalk on Oakes Street. Similar concrete walks leading to the three front entrances of the north and south apartments intersected this central walk at right angles. At each of these three intersections was a circle in which there was either a fish pond or shrubbery. The spaces between these walks were sodded lawns with some shrubbery. Oakes Street was paved and had a concrete curbing extending all the way in front of the 145 feet and onto the 18 feet, where it curved to the east and extended into Woodrow Street to the intersection of the east property line of Oakes Street, where it terminated. There was a 4-foot concrete sidewalk a foot or two east of this curbing, which connected with a similar sidewalk extending east along the 18-foot strip to its eastern border. Its south side was just 2 feet north of the north line of the S. 145 feet, and its north side just a few inches south of the east end of the curbing. This curbing was 11.25 feet south of the north line of the 18-foot strip. The north apartment had three rear entrances to the north, corresponding with the three front entrances to the south opening on the court. These north entrances each had a concrete platform or stoop in front of it and a concrete walk extending north and connecting with the sidewalk on the 18-foot strip. These north entrances were used as service entrances for delivery of articles by tradesmen and the like, who parked their cars on Woodrow Street just north of the sidewalk on the 18-foot strip. To the rear of the apartments were garages built in an L shape along the entire east side of the S. 145 feet and west along its south side to a point 4 feet east of the east line of the apartments, leaving a space of 4 feet between the S. E. corner of the south apartment and the N. W. corner of the south line of garages. These garages faced west and north and were for the use of tenants in the apartments. A concrete driveway extended from the sidewalk on the 18-foot strip in front of these garages, over which cars passed to and from the garages into Woodrow Street, which furnished the only means of ingress and egress. The dwelling on the S. 145 feet had been moved to a lot immediately east of the 18-foot strip and S. 145 feet, facing north on Woodrow Street. This lot was owned by Cortese and occupied by him as his homestead. The north wall of the north apartments was 13.5 feet south of the north line of the S. 145 feet and 15.2 feet south of the south side of the sidewalk. On the north side of Woodrow Street were five dwelling houses, which faced south. In front of them was a concrete curbing and sidewalk extending from Oakes Street. This curbing was 33.1 feet north of the end of the curbing which curved east from Oakes into Woodrow Street on the south. This clear space of 33.1 feet was all used as the vehicular traveled portion of Woodrow Street, and had been so used for many years. It was the only means of ingress and egress to and from the residences fronting on Woodrow Street. Two of the witnesses testified they were born in residences on the north side of Woodrow Street, had lived there all their lives, and the street had always been as wide as it was then. There was no dispute in the testimony on this point.

June 6, 1931, United Bond Company of Texas and Howard C. Wade, Trustee, recovered judgment against Cortese and wife for $79,695 (the amount of principal, interest and attorney's fees then accrued on the bonds) with foreclosure of the trust deed and mechanic's lien on the S. 145

feet and the furnishings, etc., of the apartments. July 7, 1931, Wade as trustee and C. C. Crocker as cotrustee executed a deed conveying the S. 145 feet to Howard C. Wade, trustee. This deed recited the previous appointment of Crocker as cotrustee, default in the indebtedness, and advertisement and sale of the property, all in accordance with the terms of the trust deed. July 13, 1931, Cortese and wife conveyed the S. 145 feet, furnishings, etc., to Howard C. Wade, trustee, in consideration of the satisfaction of the judgment and of the indebtedness evidenced by the mechanic's lien and trust deed instruments. This property passed to appellee by deeds executed in August and September, 1937, as follows: Wade, as trustee, to Martz, trustee; Martz, trustee, to Yost; Yost and wife to Bradshaw; and Bradshaw to Texas Trust & Security Company, trustee.

February 5, 1938, Cortese and wife conveyed the 18-foot strip to Neilon by general warranty deed. Some time later Neilon erected a line of cedar posts just inside the south line of the 18-foot strip, he also placed some iron or steel slabs on the property, preparatory to attaching them to the posts as a fence. One of these posts was east of the driveway leading to the garage. Neilon testified that he had no intention of erecting the fence across the driveway, the post being erected at that point merely to mark his property line. In this connection, we quote from appellants' brief: "Although (as previously shown) there is no connection between appellee and the persons who are entitled to the use of such driveway, the existence of a driveway from the garage north across the 18-foot tract to Woodrow Street is not and has never been denied by the appellants, and they have not threatened nor intended to block such a driveway."

In so far as concerns the existence of an easement, this admission limits the controversy to that portion of the 18-foot strip lying west of the driveway.

Shortly after these posts were erected this suit was brought.

■ The first proposition complains of that portion of the judgment which denied recovery to Neilon on his cross-action at least to the fee to the 18-foot strip, subject to the easement. Appellee's suit was primarily for an injunction, not for title to the property. In its petition it asserted title to the entire property, including the 18-foot strip, but in the alternative

limited its title to the S. 145 feet. The clear purpose of the suit was to establish and protect the asserted easement over the 18-foot strip. The judgment decreed title in appellee only to the S. 145 feet, established the easement over the 18-foot strip, enjoined its obstruction, and in general terms decreed that Neilon "take nothing" by his cross-action. Appellants contend that the effect of this "take nothing" judgment was to divest Neilon of title to the fee to the 18-foot strip, and vest title thereto in appellee. Ordinarily this would be the effect of a "take nothing" judgment in a trespass to try title suit. But the fact that the judgment decrees title in appellee only to the S. 145 feet, and establishes an easement only in appellee to the 18-foot strip is inconsistent with a vesting of the fee to that strip in appellee. As a matter of fact there is nothing in the entire statement of facts to indicate that appellee really claimed more than an easement over the 18-foot strip. The field notes of all instruments under which it claimed delineated only the S. 145 feet. The fact that only an easement in the 18-foot strip was decreed in appellee, and the undisputed evidence showing the fee was not in appellee, the evident purpose of the "take nothing" judgment was to deny Neilon recovery as against the only real claim of appellee to the 18-foot strip, namely, the easement therein. Appellee, in its brief, takes this position; and further asserts that it makes no claim to the fee to the 18-foot strip, and is willing to have the judgment reformed so as specifically to vest title thereto in Neilon, subject to its easement. However, it asserts that this should be at appellants' costs, since the point was not clearly raised in the motion for new trial. We think this position correct. The motion for new trial contains 44 assignments of error, the only one of which that is in any way germane to this proposition is the 26th, which is purely formal and reads: "The court erred in rendering judgment that defendants take nothing by their cross-action." While this assignment is sufficient to raise the point, we do not think it sufficient to require assessing costs of appeal against appellee in view of the above state of the record and real issues between the parties. It was no doubt construed by the trial court as attacking his judgment granting an easement over the 18-foot strip. If appellants had desired a judgment in favor of Neilon specifically for the fee to the

18-foot strip subject to the easement; an assignment, directing the court's attention to this specific point, would no doubt have resulted in a modification of the judgment accordingly. If there were any real controversy over the matter, we would have a different question.

█ The second proposition assails the injunction judgment as "erroneous and void" for uncertainty in that it enjoins appellants "from impeding certain easements, with no definite boundaries. It mentions no particular methods of interference. A casual connection between different future acts, and impediments that could later be alleged to have resulted, and whether proximate or remote, would invoke questions appropriate for disposition by a future jury."

We think the judgment amply specific in the several respects complained of in this proposition. Its pertinent portions read: .

"The court further finds that there is an existing permanent easement of the free and unimpeded use of a way to and from Woodrow Street to the garages, apartment buildings, sidewalks and entrances thereto, known as Pasadena Courts, erected upon the above-described tract of land; and

"It is, further, ordered, adjudged, and decreed, by the court that the said easement be, and the same is hereby established as a permanent easement in favor of the above-described tract of land and that said plaintiff, as the owner of the said tract of land and apartment buildings, garages, and other improvements thereon, is entitled to the free and unimpeded use of ways of ingress and egress, to and from said above-described tract of land, apartment buildings, garages, sidewalks and other improvements thereon, over and across the said land claimed by defendant, Frank Neilon, to and from said Woodrow Street, and that said defendants and each of them, their agents, attorneys and employees, be, and they are permanently enjoined from impeding the free use of said easement and from doing anything to obstruct the free and unimpeded use of the land described in the deed to plaintiff in connection with the strip of land lying on the north thereof claimed by the said defendant, Frank Neilon, either in entering the driveway or building entrances and sidewalks, or using such driveway, building entrances, sidewalk and dwellings, as same were constructed by the said J. G. Cortese and wife, and as they now are.

"It is further ordered, adjudged and decreed, that Texas Trust and Security Company as the owner of the 145 feet by 196 feet tract, above described, do have and recover of and from the defendants, Frank Neilon, J. G. Cortese and wife Katherine Cortese, an easement for said tract over and upon the premises lying between said tract and Woodrow Street to the extent and for the purpose and uses as set out in the description in the easement as herein above decreed."

██ The third proposition asserts the abstract principle of law that identity of name is not evidence of identity of persons where evidence to the contrary has been introduced. This proposition relates to the deed from Wade, trustee, to Martz, trustee. The facts are these. The deed recited that the grantor was "Howard C. Wade, of Detroit, Michigan," it was dated August 31, 1937, signed, "Howard C. Wade, Trustee," in the presence of two subscribing witnesses, and acknowledged before a notary public in Essex County, Ontario, September 1, 1937, the notary reciting the personal appearance before him of "Howard C. Wade, Trustee, known to me to be the person whose name is subscribed to the foregoing instrument." The only evidence discrediting this deed was that of Cortese who testified that the signature was not genuine. This he based solely upon his knowledge of Wade's signature from having seen him sign his name to an instrument dated December 15, 1928. This instrument was introduced in evidence and bore the signature, "H. C. Wade." Photostatic copies of this signature and that to the 1937 deed are inserted in the statement of facts. Cortese was not a handwriting expert, his only experience in that regard being that of handling checks in connection with the grocery business. He was not familiar with Wade's handwriting, and his testimony was predicated solely on his judgment as to the lack of similarity between the 1928 and 1937 signatures. The only probative effect of his testimony, therefore, was to establish the genuineness of the signature to the 1928 instrument, which was not in fact questioned. Unless, therefore, it can be said that the two signatures are so dissimilar as that they could not have been written by the same person, the presumption of identity was not overcome.

Conceding a marked dissimilarity in a number of respects, the following facts must be borne in mind. The second signature was written nearly nine years after the first, and it is matter of common knowledge that handwritings often change over a period of years. The first signature was evidently written hurriedly, and only initials were used, whereas the second was of the full name, followed by the word, "trustee." Not a single circumstance casts suspicion upon the genuineness of the deed. The grantor describes himself just as the trustee in deed of trust is described, and the notary officially certifies to his own knowledge of identity of the suscribing person to be the one whose acknowledgment was taken. There is another important circumstance in favor of the genuineness of the instrument. Not only did the deed purport to pass the legal title to the property, but possession was held under it. The property consisted of apartment houses rented to tenants, and required constant attention. The trustee was actually managing the property for the beneficial owners who were the bondholders. We think it should take more than mere apparent dissimilarity in these signatures to a nonexpert observer to overcome the presumption of identity under the peculiar facts and circumstances of this particular case.

The fourth proposition (also in the abstract) is to the effect that to entitle a plaintiff to an easement appurtenant he must show ownership of the dominant estate. This proposition is germane to the contention in the third proposition, to the effect that the Wade who executed the 1937 deed was not the Wade in the trust deed and therefore the title to the S. 145 feet was still outstanding in Wade, trustee. We overrule this proposition on the same grounds as those upon which we overrule the third proposition.

■■ The fifth proposition assails that portion of the judgment which decreed title to the S. 145 feet in appellee and awarded writ of possession, in that there was no pleading upon which to predicate that judgment. Specifically, this proposition is predicated upon the failure of the petition to allege ouster or that appellants had ever taken or threatened to take possession of the S. 145 feet. The suit was not in form in trespass to try title, but for an injunction. The petition did allege title in appellee as a predicate for its claim of easement and right to an injunction. The prayer included request for decree of title in appellee. Title to the S. 145 feet was essential to the asserted easement, which title was pleaded and proved. Cortese was the admitted common source of title. A judgment must, as between the parties, establish title to the dominant estate. That part of the judgment decreeing title to the S. 145 feet therefore added nothing to the judgment establishing the easement. In so far as the award of writ of possession was concerned, this was mere surplusage as appellee was conclusively shown to be in possession.

The sixth proposition assails the judgment on the ground that the pleadings and evidence did not identify the land. This is based upon the fact that the field notes of the S. 145 feet in the petition omit one of the four calls. The petition first asserted title to a tract beginning in the east line of Oakes Street, thence east 196 feet, thence north to Woodrow Street, thence west with the south line of Woodrow Street to its intersection with Oakes Street, thence S. along the E. line of Oakes Street to the beginning. This description clearly included the S. 145 feet. Then followed in detail a history of the transactions regarding the erection of the apartments and other improvements, the facts upon which the easement was asserted, the acts of Neilon in erecting the line of posts, etc. In the alternative, appellee's ownership was alleged of the S. 145 feet, described as follows:

"145 feet by 196 feet, out of the Southwest corner of Acre Lot No. 32, Miles Addition to the City of San Angelo, Tom Green County, Texas, described as follows:

"Beginning at an iron pipe driven in the East line of Oakes Street, being the Southwest corner of Acre Lot No. 32; Thence with the East line of Oakes Street North 19 20 feet East, 145 feet to an iron pipe driven in the ground for the Northwest corner of this tract; Thence North 69 30 feet East, 196 feet for the North East corner of this tract; Thence South 19 deg. 20' West, 196 feet along the South line of Acre Lot No. 32 to the place of beginning."

The previous allegations regarding the right to the easement over the 18-foot strip are then alleged by reference.

■ It is manifest that the detailed boundaries are incomplete in the particular that there is a missing call. If there

were nothing in the pleading itself from which the error might be corrected, there might be merit in appellants' proposition. But the fact that the tract is first described as 145 feet by 196 feet out of the southwest corner of Lot No. 32, etc., and the fact that its beginning point and frontage of 145 feet on Oakes Street, and the length of its north line as 196 feet are given, are sufficient in themselves to delineate the tract and supply the missing call. No objection was made to the introduction of appellee's title deeds and other instruments based on this defect in description, which was manifestly a purely clerical error in copying.

■ The seventh proposition is that a mere agent of the dominant owner cannot sue in his own name to establish an easement and enjoin its obstruction. This may be true in the abstract as applied to a mere agent. It has no application to a trustee holding the legal title and in actual possession of the property, with full power to manage and control it, accounting to the beneficiaries for the net revenues. See 26 R.C.L., p. 1340, § 205. That was in effect the situation here. Wade, as trustee under the trust deed, was given very ample powers, including the right to take possession of the property and manage it, the power to sell and become the purchaser at such sale as trustee, the power to sue to foreclose the lien. When Cortese and wife conveyed to him as trustee, in settlement of the judgment and liability on the trust deed indebtedness, such conveyance was manifestly for the benefit of the bondholders, and vested in Wade the full legal title to the property conveyed. Cortese and wife are estopped by their deed to assert otherwise. Under the circumstances, the title thus conveyed was impressed with the same trust that theretofore existed, except only that the beneficiaries had become the equitable owners of the property instead of mere lien holders. It is not material to speculate upon what rights the bondholders may have had or now have to dissolve the trust and have the legal title vested in themselves, resort to partition of the property, or otherwise dispose of it. The property is such that manifestly it cannot be partitioned in kind. Nor could a stranger to the title question the validity of the several conveyances that finally placed the legal title in appellee in trust. As to third parties it will be conclusively presumed that the conveyances and change of actual possession and management of the property were with the consent of the beneficiaries. However, we do not have to resort entirely to presumption. Testimony of one of appellee's attorneys of record, elicited by appellants' attorney, was to the effect that appellee held the property in trust for a large number of bondholders to whom it accounted for the net revenues, less its commission for services as trustee. We think the powers of appellee ample to maintain the suit; whether in its own name or as trustee, was unimportant from the viewpoint of appellants.

■ The eighth and ninth propositions present the point that no easement passed to Wade, trustee, because the deed conveying the property was predicated upon the trust deed, which was executed before the improvements on the property were completed and at a time when no easement existed over the 18-foot strip; and the deed to Wade merely conveyed such title and "appurtenances" as were conveyed in the trust deed. This theory is not tenable. In executing the trust deed, Cortese and wife did not alienate the S. 145 feet, they merely encumbered it with a lien to secure an indebtedness. They owned both the S. 145 feet and the 18-foot strip, and there was therefore no dominant or servient estate, and consequently there could be no easement. It matters not, therefore, whether the improvements were completed when the trust deed was executed in so far as concerns the easement. Whether an easement was created in the 18-foot strip depends upon the situation existing at the time Cortese and wife conveyed. That situation was the same as it was at the trial.

■ The tenth and thirteenth propositions urge the point that no easement was granted over the 18-foot strip by the deed to Wade, because there were other ways of ingress and egress to the improvements erected on the premises. As above pointed out, the brief admits the existence of a right-of-way easement for ingress and egress of vehicles over that portion of the 18-foot strip; but contends that no easement was created over the remainder of the strip, because other means of ingress and egress into and from the north apartments were available. The principle applicable to the situation here is thus concisely stated in 17 Am.Jur., p. 945, § 33: "It is a well settled rule that where, during the unity of title, an apparently per-

manent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude, at the time of the severance, is in use and is reasonably necessary for the fair enjoyment of the other part of the estate, then upon a severance of the ownership, a grant to the right to continue such use arises by implication of law."

This principle was applied in Miles v. Bodenheim, 193 S.W. 693, error refused.

The undisputed facts which make this principle applicable are: At the time of the conveyance to Wade the S. 145 feet had constructed on it expensive apartment houses with garages to the rear for the use of tenants. These garages were provided with a concrete driveway extending to the sidewalk on the 18-foot strip, which driveway, projected across the 18-foot strip, provided the only vehicular means of ingress and egress to and from the garages. The roadway portion of Woodrow Street was and for many years previous had been 33.1 feet wide. This roadway extended to within 6.9 feet of the north line of the S. 145 feet. On this strip of 6.9 feet Cortese had constructed a 4-foot concrete sidewalk extending all the way from Oakes Street to the east line of the 18-foot strip, and had constructed concrete walks leading to each of the three rear entrances to the north apartments. The obvious purpose of these walks and sidewalk was to afford rear entrances from Woodrow Street to the north apartments. Such was their manifest use at the time Cortese and wife conveyed to Wade, and such continued to be their use up to the time of trial. The obvious, open, notorious facts admit of no other conclusion than an intention to devote the 18-foot strip to the service of the north apartments as rear service entrances and to a passageway for vehicles to and from the garages.

This holding disposes of the twelfth proposition which merely asserts in the abstract that an easement can only be created by deed.

The eleventh proposition complains of refusal to admit in evidence an unsigned draft of a mechanic's lien from Cortese and wife to Marinick, dated January 31, 1928, two days before the mechanic's lien under which the apartments were constructed was executed. This draft contained a plat which showed a strip of land between Woodrow Street and the S. 145 feet, and it was offered to show that the intention of the parties was not to include in the mechanic's lien the 18-foot strip. There is no issue as to the boundaries of the S. 145 feet, and no contention here that a lien was created on the 18-foot strip either by the mechanic's lien or the trust deed. Nor is it contended that appellee owns the fee to the 18-foot strip. All that is contended for in that regard is an easement arising by implication from the conveyance by Cortese and wife to Wade. The draft was not admissible for any purpose.

The trial court's judgment is reformed so as to award the fee to 18-foot strip to Neilon, subject to the easement as decreed in that judgment. As so reformed and in all other respects the trial court's judgment is affirmed. All costs are assessed against appellants.

On Appellants' Motion for Rehearing.

Our attention is directed to the following errors in our original opinion which are hereby corrected in the interest of accuracy:

1. On page 2 [147 S.W.2d 324], in stating the powers of the trustee under the deed of trust is included the right to purchase at trustee's sale, this is error, we do not find that particular power granted the trustee. The same error is repeated on page 12 [147 S.W.2d 328].

2. Under the first proposition we stated that the only assignment in the new trial motion relating to this subject was the 26th. There are in the motion two other assignments, the 10th and 27th, to the same effect, and subject to the same comment. The three assignments read:

"10. The court erred in rendering judgment that nothing be taken by the cross-action on file herein."

"26. The court erred in rendering judgment that the defendants take nothing by their cross-action."

"27. The court erred in rendering judgment that the defendant, Frank Neilon, take nothing by his cross-action."

With these corrections the motion is overruled.

Overruled.